UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                         Case No.   19-CR-0058

EY LAO and LOLA CHANG,

        Defendants.

**DECISION AND ORDER DENYING MOTION TO SUPPRESS**

Defendants Ey Lao and Lola Chang have been charged by a grand jury with possession with intent to distribute more than fifty grams of actual methamphetamine in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A), and 18 U.S.C. § 2. Lao is also charged with possession of a firearm by a felon in violation of 18 U.S.C. § 924(g)(1), and possession of a firearm in relation to a crime of drug trafficking in violation of 18 U.S.C. § 924(c)(1)(A). Presently before the court are the defendants' motions to suppress all evidence obtained as a result of law enforcement's interaction with them after their car slid off the road during a snow storm in Brown County, Wisconsin on March 1, 2019. For the reasons set forth below, the motions are denied. What follows are my findings of fact based on the evidentiary hearing held on June 17, 2019.

**FINDINGS OF FACT**

March 1, 2019, was a snowy day in Brown County Wisconsin. The traffic conditions were such that even supervisors were called upon to respond to the high volume of reports of accidents and cars stuck in ditches. At approximately 11:30 p.m., Lieutenant Jason McAuly of the Brown County Sheriff's Department came upon a black BMW sedan that had slid off the exit ramp on U.S.

Interstate Highway 41 northbound at the exit to County Highway MM in the Town of Ledgeview. Defendant Ey Lao was in the driver's seat and Defendant Lola Chang was riding as a passenger. The car had apparently spun out of control and traveled well off the road into the heavy snow so that it was perpendicular to the roadway facing back toward the road on which it had been traveling. Lt. McAuly pulled up on the shoulder of the road directly in front of the vehicle, activated his emergency lights, and made contact with the occupants. Almost immediately, his suspicions were aroused.

Lao lit up a cigarette as he lowered his driver's side window and appeared nervous. He was moving around in his seat, he spoke rapidly, his hands were shaky, his voice quivering, and he repeatedly stated that they had called for help and a tow truck and was in route. He said they had been waiting approximately forty-five minutes. Lt. McAuly found Lao's behavior particularly suspicious because it was his experience over his twenty-four years as a law enforcement officer primarily working patrol that people who slide off the road in a snow storm or find themselves stranded because their car breaks down are usually relieved when a police officer arrives. The arrival of a law enforcement officer normally made people feel more safe. Lao seemed anxious for McAuly to leave. He was also speaking sharply and loudly to Chang in a language Lt. McAuly assumed was Hmong. At that point, Chang got out of the car, opened the trunk and retrieved a large "eye" bolt designed to screw into the vehicle so it can be towed without causing damage.

Lt. McAuly had no intention of leaving Lao and Chang by the side of the road in a snowstorm, absent an emergency requiring him to respond elsewhere. His primary concern upon stopping was the safety of the occupants. Once he determined they were safe, he intended to make sure they remained safe until help arrived. Lt. McAuly wanted to keep them safe from other

2

vehicles traveling along the highway by positioning his squad in front of them and making sure they stayed out of the roadway. Lt. McAuly was also concerned, at least initially, that Lao may have violated one or more traffic laws, including driving too fast for conditions, or possibly operating under the influence or operating without a valid license. He couldn't determine from his initial observation whether there was any damage to reflector posts or other property along the highway and intended to look into that as well.

At that point, Lt. McAuly asked Lao and Chang for identification in accordance with the common practice of his department and asked that they remain in the vehicle. The reason for requesting identification is to find out who the officer is dealing with for safety concerns, to check for warrants, and to make sure the driver has a valid driver's license so he can drive away from the scene. Lao and Chang provided Lt. McAuly identification, and he returned to his squad to run their names through the relevant data base. As he was doing so, Lao got out of the vehicle. Lt. McAuly exited his squad and told him to return to the vehicle. Lao seemed reluctant to do so, and Lt. McAuly remained standing outside his squad until Lao complied. Upon running their identifications on his computer, Lt. McAuly found that each had significant records, including felony records for drug offenses, and that they were on extended supervision to the State of Wisconsin.

After learning that each had prior felony drug convictions and was on extended supervision (the Wisconsin equivalent of supervised release under federal law), and based on what he concluded was reasonable suspicion that they were involved in criminal conduct, Lt. McAuly radioed Sergeant Timothy Johnson for back-up. Lt. McAuly explained to Sgt. Johnson that they were acting strangely and Lao seemed very nervous. Sgt. Johnson arrived on the scene shortly thereafter. Lt. McAuly

3

then asked for and was given consent by Lao to perform a pat down search of his person to make sure he wasn't armed. In the course of the search, Lt. McAuly found a penlight for detecting counterfeit currency and a lanyard with a set of keys attached. He likewise asked for and was granted consent by Chang to conduct such a search of her person.

Chang had been hunched forward with her head down and eyes lowered for much of the interaction with Lt. McAuly. Because of her behavior, and the manner in which Lao had initially spoken to her, Lt. McAuly thought she and Lao might have been fighting. When he conducted the pat down, Lt. McAuly discovered that she was holding under her shirt a rectangular box-like object that appeared to be a small gun safe. It was locked but the corner of a plastic bag was sticking out of it. Chang denied ownership of the object or knowledge of what was in it. Lt. McAuly then asked her if it was abandoned, and she responded "yes," even though she had been holding it under her shirt. In the course of his pat down search, Lt. McAuly also discovered that Chang had a knife with a spring-loaded blade under her bra strap.

The discovery of the knife and the gun safe with the corner of a plastic bag sticking out, along with Chang's responses, led Lt. McAuly to believe that there might be drugs or guns present. He asked Sgt. Johnson to detain Lao, and then looked through the car windows of the vehicle with the aid of a flashlight. In the front passenger side door pocket, Lt. McAuly saw a razor blade stuck into a piece of cardboard, which he associated with drug use or sale, and in the driver's side door handle area what appeared to be drugs in a plastic container.

Wisconsin Act 79 authorizes a law enforcement officer to search the residence or any property under the control of a person who has been placed on community supervision without consent or a warrant if the officer reasonably suspects that the person is committing, is about to

4

commit, or has committed a crime or a violation of a condition of release. Wis. Stat. § 302.113(7r). Based on his understanding of Act 79, Lt. McAuly concluded that he had lawful authority to search the gun safe he had taken from Chang. A key for the gun safe was discovered on the lanyard holding Lao's car keys. Lt. McAuly unlocked and opened the gun safe where he discovered a large quantity of what appeared to be controlled substances, a digital scale and a scraping tool. Lao and Chang were then placed under arrest, and the vehicle was impounded. A later search and the follow-up investigation disclosed additional evidence, but the parties agree that the admissibility of all of the evidence rises or falls on the lawfulness of the actions described by Lt. McAuly.

Before turning to the legal analysis, I note that Lt. McAuly and the other law enforcement officers who testified, Sergeant Timothy Johnson and Deputy Tyler Callow, appeared credible in their undisputed testimony. I also find that they were acting in good faith at all times in their effort to conduct the investigation they thought necessary under the circumstances within the bounds of the law.

## LEGAL ANALYSIS

The defendants claim that they were "stopped, detained, seized and searched in violation of the Fourth Amendment to the United States Constitution," and that "[t]he illegal stop, detention, seizure and search of Lao's person and Chang's person on March 1, 2019, . . . resulted in the seizure of car keys on a lanyard, 75.6 grams of suspected methamphetamine separately packaged, and scale as well as a counterfeit money detector pen," along with various other items of property. Dkt. No. 21 at 1–2. Because of the violation of their constitutional rights, they contend all evidence obtained against them must be suppressed.

5

The Fourth Amendment proscribes "unreasonable searches and seizures" by the government. U.S. Const. Amend. IV. A law enforcement officer may "seize" or arrest a person when there is probable cause to believe the person has committed a crime. *Maryland v. Pringle*, 540 U.S. 366, 369–70 (2003). An officer may briefly detain an individual upon a reasonable suspicion based on articulable facts that the individual has committed, is committing, or is about to commit a crime. *Terry v. Ohio*, 392 U.S. 1 (1968). Absent exigent circumstances, a warrant issued by a neutral magistrate is generally required before a search of an individual's personal property can be lawfully conducted under the Fourth Amendment. *Coolidge v. New Hampshire*, 403 U.S. 443, 455 (1971).

In this case, the defendants contend that Lt. McAuly unconstitutionally seized them when he took their driver's licences for identification and ordered them to stay in the vehicle. They contend that at that point, Lt. McAuly lacked even the reasonable suspicion required for a brief detention under *Terry*. A further violation occurred, the defendants contend, when Lt. McAuly used the key he obtained from the lanyard in Lao's pocket to open the locked gun safe. Even assuming there was probable cause at that point to believe the gun case contained evidence of a crime, the defendants argue that Lt. McAuly was required to obtain a warrant before opening a locked container. I will address each alleged violation in turn.

**A. Request for Identification**

The facts of this case are similar to those confronted by the Wisconsin Court of Appeals in *State v. Ellenbacker*, 159 Wis. 2d 91, 464 N.W.2d 427 (Ct. App. 1990). In *Ellenbecker*, a state patrol inspector pulled his squad car behind a vehicle stopped on the side of the road with its hood up and jumper cables laying on the ground nearby. A passenger told the officer that the owner had gone for help. When the owner, Ellenbecker, returned with gas a few moments later, the officer

6

asked for his driver's license. After first questioning why the officer wanted to see his license, Ellenbecker complied. The officer called dispatch and learned that the license was revoked. *Id.* at 94. Unable to post the required bond, Ellenbecker was placed under arrest, and in a search incident to his arrest, evidence of possession of controlled substances with intent to deliver were discovered. Ellenbecker moved to suppress the evidence, arguing that the "motorist assist" turned into an unlawful seizure when the inspector asked for his license, because at that point he was not free to leave. *Id.* at 95. The lack of freedom was compounded, Ellenbecker argued, when the inspector further detained him by running a status check on his license. *Id.*

In affirming the trial court's denial of Ellenbecker's motion to suppress, the court of appeals first questioned whether there had been a seizure:

> Frankly, we doubt there was a seizure of Ellenbecker given the particular circumstances of this case. The contact between the police and Ellenbecker resulted not from an investigative stop but from a motorist assist, which is a valid police-citizen contact. More importantly, it was Ellenbecker's need to attend to his disabled car rather than the inspector's actions which took away Ellenbecker's freedom to leave.

*Id.* Even assuming a seizure occurred, however, the court nevertheless concluded the officer's conduct was reasonable and no constitutional violation occurred. The officer's conduct was reasonable, the court held, "because the public interest in permitting an officer to request a driver's license and run a status check during a lawful police-driver contact outweighs the minimal intrusion on the driver." *Id.* at 93.

While the Wisconsin Court of Appeals decision in *Ellenbecker* is not binding on this court, I find the court of appeals' reasoning persuasive. As in that case, the contact between the defendants and Lt. McAuly resulted not from an investigative stop but from a motorist assist. And as in that case, it was a problem with the defendants' car—here, the fact that the car was stuck in

7

the snow—not the officer's conduct that took away the defendants' freedom to leave. *Cf. Delaware v. Prouse*, 440 U.S. 648 (1979) (holding randomly stopping automobile and detaining the driver in order to check his driver's license and the registration of the automobile unreasonable under the Fourth Amendment). Having already called for a tow truck, there was no reason for the defendants to traverse through the snow. Lt. McAuly merely directing them to remain in their car added little to the restraint they were already under due to the snowy conditions and their snowbound car. But even assuming Lt. McAuly's request for their identification and his instruction to remain in the car while he checked them against the law enforcement database did constitute a seizure within the meaning of the Fourth Amendment, I agree with the *Ellenbecker* court that it was justified under the circumstances.

Law enforcement officers have a duty to provide assistance to motorists stranded along the highway. When they happen upon a stranded motorist, they generally do not know the person or persons they are required to help. In the vast majority of cases, the people the officer encounters will be law abiding motorists whose car broke down or who ran out of gas, or as in this case, became stuck in the snow. But an officer can also be someone who has committed or is in the process of committing a crime and to whom, for that very reason, the presence of a law enforcement officer represents a threat to his or her freedom. Absent some assurance of the individual's identity and whether the individual has a record of criminal conduct or an outstanding warrant for his or her arrest, a law enforcement officer is vulnerable to whatever threat such a person might pose. Asking for identification and checking the person or persons against a law enforcement database before undertaking to provide such assistance significantly reduces that threat. Thus, as the *Ellenbecker* court recognized, there is a strong public interest in allowing a law enforcement officer to request identification from a person under such circumstances.

The intrusion upon the privacy interests of the driver, on the other hand, is minimal. Lao and Chang were already stopped, and the tow truck had yet to arrive. Providing their names and driver's licenses to Lt. McAuly imposed no burden and required them to disclose no information they were entitled to keep private. Indeed, as the driver, Lao was required to have his license on his person. As the *Ellenbecker* observed, Wisconsin law "implicitly recognizes this public interest by giving a law enforcement officer the authority to require a driver of a motor vehicle to display his or her license on demand." *Id.* at 97 (citing Wis. Stat. § 343.18(1) ("Every licensee shall have his or her license document in his or her immediate possession at all times when operating a motor vehicle and shall display the license document upon demand from any judge, justice, or traffic officer.")). Given the respective interests at stake, I conclude that Lt. McAuly's actions in requesting the defendants' driver's licenses and checking them against a law enforcement database were reasonable and not in violation of the defendants' Fourth Amendment rights.

Lt. McAuly's actions were also justified, however, even if suspicion of a traffic violation was required. Lt. McAuly testified that there was reason to believe that Lao had been driving too fast for conditions in violation of Section 346.57(2) of the Wisconsin Statutes, given the fact that the car was well off the road in the heavy snow and was perpendicular to the roadway with the front end closest to the road. Although the cross examination of Lt. McAuly raised the question of whether someone could run into a sheet of black ice and leave the roadway without running afoul of the statute, the description of where the car was located and the weather conditions at the time provide more than enough evidence for a reasonable officer to infer that Lao was going too fast for the conditions. While Lao had ended up well off the road and turned completely around, Lt. McAuly observed other cars driving on the same exit ramp without apparent difficulty. Combined

with Lao's suspicious behavior and the possibility of undetected property damage under the car or hidden in the snow, obtaining identification of the driver and potential witness was justified as a brief investigatory stop under *Terry*, if not a full traffic stop under *Berkemer v. McCarty*, 468 U.S. 420 (1984). For all of these reasons, I conclude that Lt. McAuly's initial request for the defendants' identification and his decision to run them against a law enforcement database were reasonable.

## B. Search of the Gun Safe

The defendants also contend that even if Lt. McAuly was justified in requesting their identification, he violated their Fourth Amendment rights by searching the locked gun safe without first obtaining a warrant. This argument also fails.

Upon running their names through his squad computer, Lt. McAuly knew that both Lao and Chang were on extended supervision for drug felonies. Under Wisconsin's Act 79, "[a] person released [to extended supervision], his or her residence, and any property under his or her control may be searched by a law enforcement officer at any time during his or her period of supervision if the officer reasonably suspects that the person is committing, is about to commit, or has committed a crime or a violation of a condition of release to extended supervision." Wis. Stat. § 302.113(7r). Such "special needs" statutes which allow law enforcement to conduct warrantless searches of the person or property of individuals whose liberty is limited by the rules governing probation and parole have been upheld against Fourth Amendment challenges. *See Griffin v. Wisconsin*, 483 U.S. 868 (1987); *Samson v. California*, 547 U.S. 843 (2006). Acting under the authority of Act 79, Lt. McAuly's search of the gun safe he took from Chang was reasonable.

The facts known by Lt. McAuly at the time he conducted the search of the gun safe were more than sufficient to provide the reasonable suspicion required by Act 79. In addition to the

10

suspicious behavior he had noted earlier, Lt. McAuly had by the time of the search conducted a consensual pat down search of Lao, which produced the lanyard with the key to the safe and a counterfeit currency detecting pen. His search of Chang had produced the locked gun safe with the corner of a plastic bag sticking out, and a spring-loaded knife concealed in her bra, accompanied by Chang's denial that the gun safe belonged to her and her statement that it was abandoned property. A gun safe alleged to be abandoned property in the possession of two felons is itself suspicious, but in addition, Lt. McAuly had observed in the passenger side door pocket a razor blade stuck in cardboard, which he reasonably associated with drug use, and on the driver side a plastic container with what appeared to both him and Deputy Callow, who had arrived to assist, to be cocaine. Indeed, these facts are sufficient to establish the probable cause needed to justify a warrantless search of the gun safe even in the absence of Act 79 under *United States v. Ross*, 456 U.S. 798 (1982), and *California v. Acevedo*, 500 F.3d 565 (1991).

With this information in hand, Lt. McAuly's conduct in opening the locked safe was reasonable and did not violate the defendants' Fourth Amendment rights. The defendants' motion to suppress the evidence obtained both directly and indirectly as a result of the search must therefore be denied.

**SO ORDERED** at Green Bay, Wisconsin this 21st day June, 2019.

    s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court